FRANK J. STELLA, Plaintiff, *v.* JAMES J. FARLEY ASSOCIATION, INC., et al., Defendants.

ANNE K. TOOMEY, Plaintiff, *v.* JAMES J. FARLEY ASSOCIATION, INC., et al., Defendants.

Supreme Court, Special Term, New York County, May 6, 1953.

*Richard E. Bauman* for James J. Farley Association, Inc., and others, defendants.

*William J. Ferris* for Frank J. Stella, plaintiff.

*Frank J. Stella* for Anne K. Toomey, plaintiff.

MATTHEW M. LEVY, J.  Two plaintiffs, Frank J. Stella and Anne K. Toomey, have separately sued in libel.  Their actions are grounded on the publication of the same article and are against the same defendants, James J. Farley Association, Inc., Lawrence P. Cuccia, J. & W. Newsprinters, Inc., Maurice Rodesk and James G. Donovan.  Three of the defendants (Association, Cuccia and Donovan) move, on affidavits, to dismiss the complaints pursuant to subdivision 5 of rule 107 of the Rules of Civil Practice, upon the asserted ground that the actions are barred by the Statute of Limitations.  Association and Cuccia were served with process on August 17, 1952; Donovan on August 18, 1952.  The statute requires that the suits should have been instituted within one year after the cause of action arose (Civ. Prac. Act, § 51, subd. 3).  A cause of action for libel arises when there is publication (Restatement, Torts [Defamation], § 577).  The offending article was printed in a paper called the " Yorkville Democrat ", published by the defendants and dated August 21, 1951.

Offhand, the issue thus presented by this motion would seem simple and easy of immediate solution.  Plainly, on the basis of the calendar dates mentioned the actions must have been commenced within due time.  But the law as of now is clear — the date of " publication " of an alleged libel is not determined by or even related to the printed date on the printed matter, and may well have been days or perhaps weeks before that date. I should have supposed — as an original proposition — that if one issues a libelous article and expressly dates it August 21, 1951, the person defamed by the article ought to be able to rely upon the printed date so fixed by the publisher himself as the date of publication.  Certainly it may reasonably be assumed that circulation was intended and that it was had on that date. Indeed, in another action, based upon the same alleged libel instituted by the same plaintiffs against James J. Farley individually and one Arthur Simpson (both of them officials of the defendant Association) the answers (prepared by the defendant Donovan as their attorney) admitted that the publication of

the paper in question took place on August 21, 1951. That would be my view, too, unless, of course, we are to say that actions for libel are to be discouraged by the courts. If that be our purpose, we can further shorten an unusually short Statute of Limitations (already reduced to one year) by requiring (as is now done in effect) that a defamed plaintiff sue practically immediately upon learning of the libelous article for fear that if he waits (in natural and reasonable reliance upon the printed date of issue given to the article by the defendant himself) the plaintiff may be deprived of his day in court — because the article had been " published " some time before August 21st, and the plaintiff did not know and could not readily ascertain on his own the exact date of that "publication ".

One possible result of the present rule might be the granting of immunity to a shrewd and malevolent defamer who could expressly postdate his libelous article with the preconceived intention of misleading the defamed person as to the time of publication — unless forsooth a new cause of action were created to protect against such a situation. The claimed libelous material here appears to have been authored, printed and circulated between August 11 and 20, 1951; and the present rule completely and entirely concentrates in the defendants exclusive knowledge and control of all of the elements of proof as to the precise time when the cause of action accrued to the plaintiffs — and that accrual is not affected by any awareness on the plaintiffs' part. My proposed rule, it seems to me, is fair; and, being simple of application, would avoid the tortuous presentation and analysis — necessary upon a trial of this issue — of the various processes and stages in the production and distribution of printed material: whether participated in by author, stenographer, typist, editor, rewrite man, linotype operator, printer, deliveryman, postal clerk and postman — before reaching the ultimate recipient. More important, perhaps — since aggrieved persons would be able to rely upon the precise, fixed and publicly known date of publication — the adoption of my view would result, I think, in the not too hurried commencement of actions sounding in libel, for prospective plaintiffs could with security permit themselves for a definite while to be affected by the cooling-off periods so useful in assuaging mental anguish, moral anger and spiritual hurt — probably the basic motivating factors behind most lawsuits grounded in claims of defamation.

"In the law of defamation, publication is a term of art" (CARDOZO, C. J., in *Ostrowe* v. *Lee*, 256 N. Y. 36, 38) — but it does not follow that its meaning is static and immutable. Its common-law definition has already changed, and without benefit of legislative sanction. Historically, for example, each delivery of an article containing defamatory matter was considered a publication that gave rise to a separate cause of action (*Duke of Brunswick* v. *Harmer* [1849], 14 Q. B. 185; *The King* v. *Carlisle*, 1 Chit. [K. B. 1819] 451). However, recognizing that this rule of law was ill-suited to present times of mass printing and circulation, "publication" of newspapers, magazines and books has been redefined so as to include all the steps in the process of dissemination. Thus, the composition, printing and distribution of such libelous material are deemed to constitute only one cause of action (59 Harv. L. Rev. 136; 38 Mich. L. Rev. 552; 26 Minn. L. Rev. 131). (I shall refer to this "one publication rule" later). I hopefully express the thought that, in time, the meaning of "publication" will change in line with the thesis I have here presented. Currently, however, I must conclude that the law is otherwise, and that the printed date of issue is immaterial in fixing the date of "publication". (See, generally, the cases hereinafter cited in connection with the so-called "one publication rule".)

The problem here, therefore, is, when, under all the facts in this case, was there such "publication" by the moving defendants as to give rise to a cause of action against them, and thus be the basis of the commencement of the running of the Statute of Limitations? The present actions having been instituted as against the defendants Association and Cuccia on August 18, 1952, and as against the defendant Donovan on August 19, 1952, was such commencement timely under the facts? The litigants have presented and argued the issues as if all of the moving defendants must stand or fall together. I do not (as a calendar matter) so conceive the issue. I point out — for one thing — that, in computing the time of the running of the Statute of Limitations, the day of publication is excluded (General Construction Law, § 20; *Tismer* v. *New York Edison Co.*, 228 N. Y. 156; *Metropolitan Life Ins. Co.* v. *Schmidt*, 299 N. Y. 428); and — for another — that if the date upon which these actions were required to be instituted fell on a Sunday, process could have been served on the following business day (General Construction Law, § 25-a; 1952 Report of N. Y. Law Revision Comm., N. Y. Legis. Doc. No. 65 [D]). The result is that, if publication by a

defendant were on Friday, August 17, 1951, the year ends on Sunday, August 17, 1952, and the last day within which to institute the suits against him was therefore Monday, August 18th. As has been noted, two of the moving defendants (Association and Cuccia) were served with process on that day, and the remaining defendant (Donovan) on the following day. If the publication were on Saturday, August 18, 1951, the year ends on Monday, August 18, 1952, and the same result would follow — the suits were timely commenced as against Association and Cuccia, but too late with respect to Donovan. If publication were on or prior to Thursday, August 16, 1951, then each of the three moving defendants was tardily sued. If publication were subsequent to Saturday, August 18th, then all of the three defendants have been served within due time. The detailed facts as to the preparation, printing and distribution of this issue of the " Yorkville Democrat " are thus necessary to be outlined here in order to arrive at a proper disposition of the motion.

In the spring and summer of 1951, the plaintiff Stella was a candidate for Democratic district leader in the Eighth Assembly District North of New York County. The plaintiff Toomey was Stella's coworker and supporter. Stella's opponent was the incumbent, James J. Farley. The primary election was to be held in the afternoon and evening of August 21, 1951. A committee supporting Farley had been set up, and its active members consisted, among others, of the defendants Donovan and Cuccia, as well as officers, district captains, workers and members of the defendant association. As part of the Farley campaign, it had been decided to prepare, write, issue, pay for and distribute a four-page special edition of the so-called " Yorkville Democrat ", to support the Farley cause. The Farley adherents decided to place the paper in the hands of every enrolled Democrat entitled to vote in the primary election by personal distribution throughout the district and by mailing a copy to each enrolled Democrat residing in the district.

The " Yorkville Democrat " was prepared and composed by the members of the campaign committee, including Donovan. The articles therein contained were written during the week ending August 11, 1951. They were typewritten by one Mary F. Devery, coleader of the association, by August 14th. In pursuance of Donovan's instructions, the typed copy was delivered, on or about that day, to the printer (the defendant Newsprinters, Inc., not a moving party here), after arrangements for the

printing had been made by Cuccia. By August 16th, the type had been set up and a proof run off. During the evening of August 16th, Donovan, with others, worked on the proofs in the composing room of the printer's plant, and by eleven o'clock that evening the paper went to press. Actual final printing was done during the night of August 16th-17th. Early in the morning of August 17th, the printing (consisting of about 25,000 copies) was complete and on August 17th delivery of the paper, dated August 21, 1951, was made to the clubhouse of the association. The " Yorkville Democrat " is referred to in the affidavits as a " newspaper ". A copy was not furnished the court. I gather that it may have been a pamphlet in newspaper format, although that is not definite on the papers before me.

During the entire day of August 17th, scores of men and women — captains, workers and members of the association — under Cuccia's supervision and direction, inserted about 15,000 copies of the paper in unsealed previously-addressed envelopes for mailing. Stacks of the literature were on the tables at the headquarters, to be picked up and read by those who came in during that day and evening. Throughout the whole of that day, August 17th, from early morning to late in the evening, as the workers at the clubhouse stuffed the printed material into the envelopes, these persons and others read the claimed libelous article. Anyone who wanted copies to take them for circulation throughout the district was encouraged to take and distribute them. Hundreds upon hundreds of copies were taken and disseminated by that method on August 17th. Some were dropped in stores and passed around on the street corners throughout that day and evening. The 15,000 unsealed envelopes (with the material enclosed) were claimed by the defendants to have been ready for delivery for third-class mailing to the Lenox Hill station of the post office at 10:00 P.M. of Friday, August 17th. They were (as alleged by the defendants) delivered and left at that station by eleven o'clock of that same night, and the attendants at the sub-station took them into one of the " back rooms and the last we (the representatives of the moving defendants) saw of them was when the postal employees were covering them up with canvas covers ". The plaintiffs, on the other hand, claim the delivery to have been on Saturday morning, August 18th. An issue of fact has also been raised as to whether payment of the postage was made at the sub-station or at the general post office in Manhattan; but it is conceded by the defendants that the postage therefor was not paid until

the morning of Saturday, August 18th. The moving affidavits are silent as to when mail delivery to the various addressees was made by the post office. On the one hand it is claimed that home delivery was made on Saturday, August 18th; on the other that, in accordance with the normal process in respect of third-class mailing, delivery was not made to the addressed enrollees before Monday, August 20th, at the earliest.

The defendants contend (and cite authorities assertedly in aid of their argument) that the dictation of the alleged libelous matter to the stenographer and its subsequent transcription by her was the first publication (*Ostrowe* v. *Lee,* 256 N. Y. 36); that the second publication took place when the transcribed copy was delivered to the printer (*Youmans* v. *Smith,* 153 N. Y. 214); that the third was the distribution of the printed matter to the campaign workers (*Taylor* v. *Church,* 8 N. Y. 452); that the delivery of the papers in unsealed envelopes to the post office was the final stage (*Ostrom* v. *Safir,* 165 Misc. 647; *Hartmann* v. *Time,* N. Y. L. J., April 20, 1945, p. 1503, col. 1); that on the basis of the so-called " single publication rule " (most recently expounded in *Gregoire* v. *Putnam's Sons,* 298 N. Y. 119, 127) all of the subsequent acts of publication related back to the first; and that since the first publication occurred on or before August 11, 1951, and since the suits were not instituted until August 18 and 19, 1952, they are barred by the Statute of Limitations. There are other arguments presented by the proponents of the motion which I shall later consider, but I want at the outset to make clear that I am not at all persuaded by this contention of the defendants. It is plain that they entirely misread the scope of the " single publication rule ".

Generally, the communication of a libel (to a person other than the one defamed) constitutes a publication in the eyes of the law, and each distinct publication of the libel gives rise to a separate cause of action. (*Woods* v. *Pangburn,* 75 N. Y. 495; *Roberts* v. *Breckon,* 31 App. Div. 431; *Weston* v. *Weston,* 83 App. Div. 520; *Union Associated Press* v. *Heath,* 49 App. Div. 247; *Taylor* v. *Friedman,* 214 App. Div. 198; Seelman on Law of Libel and Slander, §§ 121, 128; Cooley on Torts [4th ed.], Vol. 1, § 137). True, insofar as newspaper, magazine and book publishers are concerned, an exception (to which I have earlier referred) was created to the general rule that one who publishes a libel is accountable for each separate publication of that libel. That exception is known as the " single publication rule ", and is to the effect that after the initial general receipt

by the public of the great bulk of the printed matter, any subsequent incidental or isolated deliveries are not deemed distinct republications giving rise to separate causes of action (*Gregoire* v. *Putnam's Sons,* 298 N. Y. 119 and cases therein cited; *Wolfson* v. *Syracuse Newspapers,* 254 App. Div. 211, affd. 279 N. Y. 716; *Campbell-Johnston* v. *Liberty Mag.,* 64 N. Y. S. 2d 659, affd. 270 App. Div. 894, motion for leave to appeal denied 270 App. Div. 998 and 296 N. Y. 1056; *Hartmann* v. *Time,* 60 N. Y. S. 2d 209, affd. 271 App. Div. 781, motion for leave to appeal denied 271 App. Div. 826 and 296 N. Y. 1058; *Fried, Mendelson & Co.* v. *Halstead,* 203 App. Div. 113; *Cannon* v. *Time,* 39 F. Supp. 660; *Backus* v. *Look,* 39 F. Supp. 662; *Means* v. *Macfadden Publications,* 25 F. Supp. 993; *McGlue* v. *Weekly Publications,* 63 F. Supp. 744; *Hartmann* v. *Time,* 166 F. 2d 127; *Prout* v. *Real Detective Pub. Co.,* N. Y. L. J., Feb. 21, 1939, p. 829, col. 1; *De Priest* v. *Newspaper P. M.,* N. Y. L. J., Nov. 28, 1945, p. 1476, col. 5; *Winrod* v. *Time,* 334 Ill. App. 59; Seelman on Law of Libel and Slander, § 128). The basis of the rule is that in the light of modern processes a single mass distribution of thousands of copies constitutes, in legal effect, one publication giving rise to one cause of action against the publisher, and the cause of action accrues (so as to fix the date when the Statute of Limitations begins to run) when the bulk of the issue is released for sale or circulation in accordance with trade practice.

Assuming that the " Yorkville Democrat " is a periodically issued newspaper, I hold that the date of " publication " within the meaning of the " one publication rule " is not the date its contents were dictated to a stenographer in preparation for the printing of the paper, nor the date of the transcribing of her notes, nor the date when the article was printed, nor the date when it was read by persons engaged in inserting the copies of the paper in pre-addressed envelopes for mailing to those for whom the paper was published, nor the date of delivery to one who himself receives the material for purposes of mail distribution. If a plaintiff claiming to be libelled by the publication of a newspaper is to be limited to a single cause of action based upon a single date of publication — and subsequent issuance is not to give rise to a new cause of action — that date should in my view be the date when the newspaper is received by the general public, regardless of the fact that various persons may have read the libel as an incident to the preparation and printing of the paper and its distribution to desired readers.

The next contention of the defendants is that, at the very least, the " one publication rule " does require a holding that mass distribution by hand in the district on August 17, 1951, fixes that as the date of publication. As has been seen, that might save Donovan, but not Association and Cuccia. But, on the present papers and on the present motion, the contention is of no avail to any of the movants. In my opinion the date of publication (within the concept of the " one publication rule ") of a newspaper is not the date that a small percentage of the issue is distributed to readers, but rather the date when the great mass of the issue reaches those for whom the publication is intended. I hold that the defendants must affirmatively prove the mass distribution which must be relied upon by them, and this they have at this time failed to do. According to the moving affidavits, 25,000 copies of the paper were printed, of which between 15,000 and 16,000 were mailed, and the rest distributed and circulated from hand to hand throughout the district. The moving affidavits make no claim, however, that *all* of the un-mailed copies were distributed by hand on August 17th. The only statement as to the number of copies circulated by hand on August 17th is that of Cuccia to the effect that " hundreds upon hundreds of copies were taken and distributed in that method on that day ". Nor does it appear how many were distributed by hand on August 18th. Whether proof at the trial that a very substantial number of the copies (necessarily, however, less than 10,000) had been distributed by hand on August 17th would make that, in legal effect, the date of publication, need not be determined at this time.

Moreover (although as part of one general plan), there concededly were two specific bulk distributions — one in person and one by mail, a maximum of 10,000 copies by the first method, and about 15,000 or so by the second. Each seems to have been a " conscious independent " act of publication. (Seelman on Law of Libel and Slander, § 130.) There was certainly a separate affirmative publication by mail, an intentional effort to have a substantial number of readers receive the paper. In such case I am of the view that the Statute of Limitations begins to run anew, and that there is no relation back to the first act of bulk circulation on the basis of the " single publication rule ".

Furthermore, there is no precedential mandate that the " one publication rule ", first made applicable only to newspapers and magazines — and then by a closely divided court extended to

books (*Gregoire* v. *Putnam's Sons,* 298 N. Y. 119, 124) — is also applicable to an isolated pamphlet, circular, bulletin or brochure, which the " Yorkville Democrat " might be.  While the instant case is not one of an individual item of correspondence, such as a letter, it still might not be that of a periodical, with regular, sustained dates of distribution.  Nor is it a book which may normally continue to have repercussions — even without republication — long after its first issuance.  This may be the case of a single item of political campaign material, which more than likely will have spent its force when the primary election is over — unless of course it is in fact reiterated or republished.  Viewing with disfavor, as I do, the extension of the " one publication rule " beyond its already expanded area, I shall not as a matter of law apply it to pamphlets, as distinguished from books, magazines and newspapers.  Whether the publishers of the " Yorkville Democrat " are entitled to the benefits of the " one publication rule " must therefore await a trial.  In the meanwhile, we are relegated to a consideration of the facts on the basis of earlier legal concepts of the meaning of the term " publication " — that each republication of the libel is a new wrong giving rise to a separate and distinct cause of action.

The first publication of the libel by the moving defendants occurred on or before August 11, 1951, at which time the stenographer had transcribed her notes (and thus read them), as dictated by Donovan and others, and at which time she had typewritten and reproduced longhand drafts (see *Ostrowe* v. *Lee,* 256 N. Y. 36, *supra*).  The publication consisted in her reading her notes and in reading, typing or copying the articles written in longhand by Donovan and others.  This libel is barred by the Statute of Limitations.  A republication of the libel took place on August 14th, when, at the direction, procurement and instigation of the moving defendants, the typewritten articles were delivered to the printer, and the employees of the printer read them in order to set up the type to make proof (See *Taylor* v. *Church,* 8 N. Y. 452, *supra*).  This libel is also barred by the statute.  The next publication took place on August 17, 1951, when the completed papers were delivered to the clubhouse of the association with the expectation that the defamatory articles would be read by some third persons, and which result actually followed on that same day (See *Youmans* v. *Smith,* 153 N. Y. 214, *supra*).  That publication is barred as against Donovan only.  A fresh publication of the libelous article oc-

curred on August 17, 1951, when the moving defendants caused, procured and instigated their campaign workers to read and distribute the defamatory material at the association clubhouse, resulting in many of them being distributed from hand to hand, door to door and house to house throughout the district and being read on that day. The moving defendants are liable to the plaintiffs for this republication and the action thereon is timely as against Association and Cuccia; but as to Donovan the cause of action arising out of this republication is outlawed.

The next question remaining to be determined is when publication took place of the copies of the " Yorkville Democrat " which were mailed. Defendants claim that over 15,000 copies were left in a branch post office on Friday, August 17, 1951, before 11:00 P.M. Concededly, however, no fee was paid to the postal authorities until Saturday morning, August 18th, after the cashier's cage had opened. The opposing affidavits state that an investigation by plaintiffs' attorneys revealed that the 15,000 copies were delivered to the post office sub-station on August 18th at about 8:30 A.M.; that no mail was ever received by that station after 6:00 P.M., nor could any be deposited after that time; and that it would be impossible to deposit mail at night and pay for the postage the next day. In my view, whichever state of the facts is accepted, the act of delivery to the post office for mail distribution is not " publication ". Had the post office building containing the mailed copies burned down on Friday, August 17th, or Saturday, August 18th, before the copies left the building for delivery to the mail recipients — clearly none of the mailed copies could be held to have been published and no cause of action could have accrued to the plaintiffs on the basis of the mailed copies.

The fact that the envelopes were unsealed is immaterial, and I reason it thuswise: There is no publication of a libel unless the writing is read by a third person. (*Weidman* v. *Ketcham,* 278 N. Y. 129; *Youmans* v. *Smith,* 153 N. Y. 214; *Ostrowe* v. *Lee,* 256 N. Y. 36; Restatement, Torts, § 577, and cases hereinbefore cited.) There can be no libel — because of no publication — when a defendant communicates the defamatory statement to the person defamed in a sealed envelope. (See *Weidman* v. *Ketcham, supra; Schaller* v. *Miller,* 173 App. Div. 998; *Lyle* v. *Clason,* 1 Caines [N. Y.] 581; and cases above cited.) Nor are the sending and receipt of a writing, in an unsealed envelope, to the person defamed, a publication of the writing in the absence of a showing that it was read or heard read by someone other than

the one to whom it was sent; and there is no presumption that the letter in the unsealed envelope will be read by anyone other than the addressee (cf. *Fry* v. *McCord Bros.*, 95 Tenn. 678; *Clutterbuck* v. *Chaffers*, 1 Stark 382, 171 Eng. Reprint 533; *Huth* v. *Huth*, 3 K. B. [1915] 32, and *Ostro* v. *Safir*, 165 Misc. 647). The authorities seem to me to substantiate the rule that in the case of sending a libel in an unsealed envelope through the mails, the publication occurs only when the letter is actually received and read by the addressee, as there is no actionable wrong until the defamatory expression is brought to the attention of a third person — it is only then when it can be said to have been " published ". Accordingly, I hold here that the mailing, by itself, did not constitute a publication — and even if an inference is to be invoked, that does not properly come into fruition until the time expired for delivery to the addressees in the regular course of the mails.

The case of *Youmans* v. *Smith* (153 N. Y. 214), relied upon by defendants for the proposition that the date of publication was, at the very latest, the day of mailing of the 15,000 or so copies, is, in my opinion, authority to the contrary. In that case the question before the court was whether the defendant, a printer, was correct in contending that there had been no publication whatever by it because it merely printed the libelous matter for a customer, the author thereof. No question of what constituted the date of publication was presented for decision. In holding that there had in fact been a publication the court did say (p. 218) : " Printing a libel is regarded as a publication when possession of the printed matter is delivered with the expectation that it will be read by some third person," but it added the important qualification " *provided that result actually follows.*" (Italics supplied.) I do not believe that the court intended to declare that the date of publication is the date of delivery of the libelous matter to a person whose duty it is to attend to and effectuate its dissemination.

It is to be noted further that the question as to when these 15,000 copies were mailed out, received and read by the addressees is one of fact which cannot be decided upon the papers before me. This question should be reserved for the trial court and, depending upon its determination, Donovan's defense of the Statute of Limitations as to that phase of the case will stand or fall. If it be determined as a fact that the copies were mailed out on August 17th as alleged, and that they (or at least a substantial part of them) were received and

read by the addressees on or by the following day, then the Statute of Limitations is a good defense as to Donovan, at least insofar as mail-delivery being the criterion is concerned. If, on the other hand, the plaintiffs' contention is sustained that the envelopes were mailed out on the 18th and could not possibly have been received and read before August 20th (Monday), Donovan's defense must fail in that regard. Lastly, unless the Statute of Limitations operates in Donovan's favor, there is no question in my mind that this republication — if such it legally was — on August 20th, constitutes an actionable tort on the part of all of the three moving defendants, and that the actions are not barred as against any of them. It is not denied that, at the request, procurement and instigation of these defendants, with their consent, and with the conscious intent to induce the public to read the alleged libel, the moving defendants caused the 15,000 copies of the alleged defamatory articles to be distributed and received by mail. All persons in any manner instrumental in making a defamatory publication or in procuring one to be made, are jointly and severally responsible therefor; as is the person who writes or signs a libelous article for publication or gives information for that purpose and which material is substantially embodied in the article as published. (*Palmer* v. *New York News Pub. Co.,* 31 App. Div. 210, appeal dismissed 158 N. Y. 664; *Kraft* v. *Araujo,* 238 App. Div. 324.)

The motion is denied, but, in pursuance of rule 108 of the Rules of Civil Practice, the defendants may set up the defense of the Statute of Limitations in their answers. Thereby they may have the opportunity, if they so desire, to submit proof as to the character of the " Yorkville Democrat " insofar as the " one publication rule " is concerned, as to the number of copies distributed by hand and when, as to the date that the mailed copies substantially reached the enrolled voters, and as to any other material facts in the premises. Order signed.